IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAQUEENA EASTERWOOD, as Administrator of the Estate of DONTE L. JOHNSON, deceased, | ) ) ) ) |
| Plaintiff, | ) ) No. 17 CV 2888 ) |
| vs. | ) Honorable Judge Sharon Johnson Coleman ) |
| VILLAGE OF DOLTON, PHILIP SHEEHAN and RYAN PEREZ, | ) Magistrate Judge Sidney I. Schenkier ) ) Jury Demand ) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION AND OVERVIEW OF UNDISPUTED FACTS**

This case involves – literally – a split-second decision to use deadly force made by police officers in a tense and rapidly developing situation. The Defendants are entitled to summary judgment because as a matter of law, their use of deadly force was reasonable under the circumstances; in the alternative, the Defendants are entitled to summary judgment based on their qualified immunity under controlling Supreme Court and Seventh Circuit precedent.

**A.    Understanding The Geography.**

This incident took place during the pre-dawn hour on June 26, 2016, at the Shell Gas Station located at the intersection of Sibley Boulevard and Lincoln Avenue in Dolton, Illinois. Sibley Boulevard is a four-lane arterial (Route 83) running in an east-west direction; Lincoln Avenue is an arterial running in a northwest/southeast direction. DSOF 1.

There is a "Food Mart" building located along the east end of the property. DSOF 2. The Food Mart runs in a north-south direction. DSOF 2. Moving east along the north wall of the station, one would come upon the exit from a car wash. DSOF 2. Then there are manmade barriers. DSOF 2. There is a fence and heavy bushes inhibiting the ability of somebody to leave the station on foot moving in an easterly direction. DSOF 2. Finally, Exhibit 6 shows that there is a video camera mounted on the roof of the station right above the Food Mart sign. DSOF 3.

      **B.**    **Johnson Robs Duncan At Gunpoint.**

At about 5:00 a.m., witness Ayrias Duncan ("Duncan") who was accompanied by a female companion, drove to the Shell station so Duncan could buy some cigars. DSOF 5. Duncan got out of his car and went to the pay window. DSOF 6. The gas station attendant, Gloria Henry, who was inside the station, had a distressed look on her face. DSOF 7; 17. Duncan turned around and was confronted by decedent Donte Johnson ("Johnson"). Johnson proceeded to strike Duncan in the face with a gun. DSOF 8; 17. He then ordered Duncan to the ground, fleeced his pockets, threatened him and made Duncan remove his shoes. DSOF 9; 10. Attendant Henry saw the weapon, called 911 and then locked herself in the gas station bathroom. DSOF 17; 18.

      **C.**    **Officers Sheehan And Perez Are Dispatched To The Shell Station.**

Officers Sheehan and Perez were parked together at a grocery store parking lot. DSOF 21; 30. They received a radio dispatch communicating a subject armed with a weapon and a possible armed robbery. DSOF 21; 30. The subject was described as armed with a grey hoodie. DSOF 21.

Sheehan drove east on Sibley, then south on Lincoln, and then east into the gas station so his vehicle would be facing the Food Mart. DSOF 22. When he pulled up, he observed Johnson pistol whipping Duncan. DSOF 23. Sheehan, who was in uniform, got out of his unmarked squad. DSOF 23. Sheehan had his gun out and ordered Johnson to drop the gun, at which point, Johnson spun around and pointed the gun at him. DSOF 23. Sheehan then fired two rounds at Johnson and Johnson began to run toward a dark grey Mustang and Sheehan fired more shots. DSOF 25. Sheehan estimates only a second or so passed between his two rounds of shooting. Sheehan could still see the weapon in Johnson's hand. DSOF 23.

Sheehan's testimony is corroborated by Duncan, who saw Sheehan pulling into the parking lot and getting out of his car. DSOF 12. Duncan heard Sheehan yell, "Freeze," and saw Johnson turn and look back at Sheehan. DSOF 12; 13. Duncan saw that Johnson was still holding the gun when he turned towards Sheehan. DSOF 13. At this point, Duncan was afraid of a gunfight and rolled over on the ground and flattened himself against the pavement. DSOF 14.

Perez pulled his squad car into the Sibley driveway. DSOF 31. He saw a person with a gray hoodie swinging or doing something to an individual on the ground. DSOF 32. Perez jumped out of his car so fast that he neglected to put the vehicle in park. He heard Sheehan yell, "Gun," and then heard several shots. DSOF 33. Just before that, he saw Johnson point at weapon in Sheehan's direction. Perez saw a black weapon. DSOF 32.

At this point, Johnson began running toward the back of the gas station. DSOF 34. Perez saw the weapon in Johnson's hand as he was running. DSOF 33. Johnson did not point the weapon at Perez. DSOF 34. When Perez saw that Johnson still had the weapon in his hand, he made the decision to shoot Johnson because "I thought he was going to kill myself and my partner." DSOF 35. Johnson continued to run away from Sheehan towards the back of the

station as Perez was firing his weapon. Perez didn't know if his shots hit Johnson, but Johnson then fell to the ground by the rear of the building. DSOF 36. Johnson was still running when Perez fired his last shot. DSOF 36.

Sheehan and Perez then handcuffed Johnson and located Johnson's gun near his body. DSOF 36. The officers "cleared the weapon," meaning they removed the bullet that was in the chamber from the weapon, so the weapon would be safe. DSOF 27. Johnson died of the gunshot wounds. Johnson's weapon was recovered near his body. DSOF 37.

### D. The Videos.

There are two videos in evidence. The first is taken from inside the gas station. It shows Johnson looking over what we now know to be the body of Duncan. Johnson then straightens up, turns and then darts from left to right. Sheehan is seen running after Johnson and Perez's unattended vehicle passes from right to left. DSOF 38.

The second video is from the Food Mart. It shows Perez pulling into the station from Sibley, jumping out of the car and exiting his squad car. The squad car continues to move in a southerly direction. A figure with a gray hoodie emerges, running past the building, and Perez begins firing. Exhibit 51 and 62 are still photos from the Food Mart video showing Johnson with a weapon arguably in his hand at the bottom of the frame. DSOF 40; 41. Johnson disappears around the building as the officer is firing. The two officers then give chase. DSOF 39.

## II. SUMMARY JUDGMENT STANDARD

The summary judgment standard is set forth by this Court in, among other cases, *Moore v. Lemke*, 2016 WL 4530308 (N.D. Ill. 2016) and is incorporated herein by reference.

## III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT I BASED ON THEIR QUALIFIED IMMUNITY

### A. Framing The Issue.

Based on the undisputed facts, here are the circumstances facing the officers when they made their split-second decisions. When Officer Sheehan arrived on scene, he saw an armed robber pistol whipping a citizen. That armed robber refused a command to drop the gun, pointed his weapon at the officer, then darted away toward the rear of the building. The parties were still in close quarters. Johnson could have turned around at any second and shot Sheehan.

When Perez arrived and got of his squad, he had to make a split-second decision among three choices. He could have just stood there, exposing himself to being shot and killed; he could have chased Johnson behind the building, exposing himself to the same risk of being shot by Johnson; or he could have perceived that this armed robber still posed a mortal threat to his partner, himself, and the community and used deadly force to end that threat. Perez chose the third option.

As a matter of law, the officers' use of deadly force in this case was reasonable under the Fourth Amendment. In the alternative, the officers are entitled to summary judgment based on their qualified immunity. Because the Supreme Court has twice directed lower courts to "think hard and then think again" before addressing both qualified immunity and the merits of an underlying constitutional claim, *District of Columbia v. Wesby*, ___ U.S. ____, 138 S. Ct. 577 (2018) at Nt. 7, citing *Camreta v. Greene*, 563 U.S. 692, 707 (2011), we will first demonstrate entitlement to summary judgment based on qualified immunity.

### B. Qualified Immunity General Principles.

To defeat the defense of qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the

time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074 (2011) [citation omitted]. "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). Courts are free to proceed only on the issue of "whether the right at issue was clearly established." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).

### C. Qualified Immunity Principles In Excessive Force Cases.

In cases where qualified immunity is raised, the Plaintiff has the burden of showing both that (i) "the facts taken in the light most favorable to [him] make a violation of the constitutional rights," and (ii) "the right was 'clearly established at the time of the alleged violation.'" *Hurt v. Wise*, 880 F.3d 831, 840-41 (7th Cir. 2018), citing *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017). In its most recent qualified immunity case, *Kisella v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148 (2018), the Court set forth a number of principles applicable to excessive force cases. Courts deciding qualified immunity motions are not to "define clearly-established law at a high level of generality." *Id.* at 1152. This is especially important in cases involving excessive force where it is frequently "difficult for an officer to determine how the relevant legal doctrine (excessive force) will apply to the factual situation the officer confronts." *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015).

Because excessive force cases are so fact specific, "police officers are entitled to qualified immunity unless existing precedents squarely govern the specific facts at issue." *Kisella*, 138 S. Ct. at 1153. Such definitive on-point precedent is necessary to "move a case beyond the otherwise 'hazy border between excessive and acceptable force,' and thereby provide an officer notice that a specific use of force is unlawful.'" *Id.* at 1152, citing *Mullinix v. Luna*, 577 U.S.___, 136 S.Ct. 305, 312 (2015).

6

The principles of *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989) require that reasonableness of use of force must be judged from the perspective of a reasonable officer on the scene rather than with a 20/20 vision of hindsight along with "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly-evolving – about the amount of force that is necessary in a particular situation." However, the general principles set forth in *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985), in and of themselves, do not establish clearly-established law "outside an obvious case." *White v. Pauly*, __ U.S. ___, 137 S. Ct. 548, 552 (2017).

D.  **Applying The Qualified Immunity Analysis To The Facts Of This Case.**

We turn to the information the officers had at the time they fired their weapons. *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) ("What is important is the amount and quality of the information known to the officer at the time he fired his weapon when determining whether the officer used an appropriate level of force"). Both officers knew they were being dispatched to an armed robbery. When Sheehan arrived on the scene, he witnessed Johnson viciously attacking Duncan. Both officers were in uniform. Johnson not only refused Sheehan's command, he pointed a gun at Sheehan.

When Perez arrived on scene, Perez saw the armed Johnson point his gun at Sheehan and then flee. Video Exhibit 61 and Exhibits 51 and 62 show that when Perez got on the scene, Johnson may have had his weapon in his hand when he was running. Even if the weapon was not in his hand, a reasonable police officer could have concluded that he was confronting an armed and violent perpetrator who could have wheeled around and shot either officer dead during these split-seconds.

The question then becomes: In light of these undisputed facts, does a police officer violate clearly-established law by using deadly force against Johnson because Johnson did not first wheel around and try to kill the officers? The answer to this question is No. Controlling precedent underscores the fact that these officers had the right to use deadly force under these circumstances.

"A reasonable officer need not await the 'glint of steel' before taking self-protective action. By then it is 'often . . . too late to take safety precautions.'" *Estate of Larsen Ex Rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). The law is clearly established that when police officers are dealing with an armed threat in dangerous circumstances, the officers may use deadly force to eliminate that threat and to prevent escape. The officers do not have to wait for the threat to fire the first shot.

The Seventh Circuit has recently applied these principles in *Mason-Funk v. City of Neenah*, 895 F.3d 504 (7th Cir. 2018), a case upholding qualified immunity where the police shot a hostage thinking that the hostage was the hostage-taker. The Court concluded that "the facts in this case and existing precedent" did not put the officers on notice "that their use of deadly force without a warning on an armed individual in a dangerous hostage situation was unlawful." 895 F.3d at 510.

In *Conley-Eaglebear v. Miller*, 2017 WL 7116973 (7th Cir. 2017), officers suspected Plaintiff was carrying a weapon, ordered him to stop and chased him into an apartment building courtyard. One of the officers noticed that Plaintiff had the weapon in his hand and then shot Plaintiff twice from behind. The Seventh Circuit upheld summary judgment on the reasonableness issue, without having to resort to qualified immunity analysis. The officer saw the gun barrel and "did not need to wait for Conley-Eaglebear to face him or point the gun

8

directly at him before acting to protect himself and the community," citing *Helman v. Duhaime*, 742 F.3d 760 (7th Cir. 2014) (Use of deadly force reasonable when police shoot a person "when he was reaching for his firearm"); *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993). See also, *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) ("The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists"). The *Elliott* Court emphasized:

> No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life . . . the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self-protection.

*Id.* at 644.

In *Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018), an off-duty police officer shot and killed a suspected armed robbery subject as he was running away. As in our case, the "story here is very short and violent." *Id.* at 944. For summary judgment purposes, the Court accepted Plaintiff's version that the officer shot decedent "from behind three times as [decedent] crawled away from the officer." *Id.* at 948. The "entire encounter lasted about 36 seconds . . ." *Id.*

The Seventh Circuit affirmed summary judgment on the reasonableness issue, again without resorting to a qualified immunity analysis. Focusing on the objective standard as to many of the elements of the excessive force analysis, the Court concluded that Officer "Pobjecky objectively had reason to think Michael was armed and dangerous and posed an imminent threat of death or serious bodily harm to Pobjecky and the community. Under immense pressure and

9

with limited time, Pobjecky responded to the armed siege with reasonable, appropriate and justified force in compliance with the Fourth Amendment." *Id.* at 953.

The Court rejected the argument that was unreasonable for the officer "to shoot [decedent] in the back to prevent escape," "**because for all a reasonable officer could have known, [decedent] could have turned and produced a gun in a flash given all the facts and circumstances.**" *Id.* at 952 [emphasis added]. The Court concluded that even if the officer only shot decedent "in the back as he crawled away," "this shooting would still have constituted a reasonable prevention of escape despite Pobjecky's testimony, and this shooting would still have constituted a reasonable act in defense of self and others." *Id.*

These governing principles were most recently illustrated by a Sixth Circuit case, *Wilkerson v. City of Akron*, 906 F.3d 477 (6th Cir. 2018). Two officers were involved in a struggle with a subject carrying a handgun. The subject then ran away, at which point, an officer "fired two shots in quick succession," killing the subject. *Id.* at 480. The Court of Appeals affirmed summary judgment on the excessive force issue, noting that among other things, "no one disputes the absence of evidence that [decedent] left the gun behind. In the moments preceding the decision to fire, a reasonable police officer would have had probable cause to believe this subject posed an immediate threat to both officers." *Id.* at 282. The Court then rejected Plaintiff's argument "that Thomas did not pose a threat to the officers when he ran away," and was not capable of shooting the officers because his pants were falling down. *Id.* at 483. ("Once an officer reasonably believes a suspect is dangerous to him, other officers, or other citizens, he may use deadly force and may do so even if the suspect attempts to flee"), citing *Graham*, 490 U.S. at 396. Importantly for purposes of this case, the Court then emphasized that

Thomas still had the weapon while he was being chased, **"and nothing prevented Thomas from turning to fire upon the officers."** *Id.* at 483 [Emphasis added].

Finally, in a Seventh Circuit case decided some 30 years ago, the Court affirmed summary judgment in a case where "the defendant police officer shot Ford as he was fleeing from the scene of an armed bank robbery." *Ford v. Childers*, 855 F.2d 1271, 1272 (7th Cir. 1988). The Court found that the officer had "probable cause to believe that Ford posed a threat of serious physical harm to himself and/or two others and warned Ford before firing his revolver," and thus found the use of force objectively reasonable.[1]

In our case, it is undisputed that Johnson was armed, committed a violent crime, pointed the gun toward Officer Sheehan, ignored Sheehan's commands, and then ran. It is also undisputed that the entire incident spanned but a few seconds. Under these circumstances, a reasonable officer could have concluded that he had the right to "employ deadly force to prevent a suspect's flight" because "in the moments immediately preceding the officer's decision, he 'has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or others.'" *Wilkerson*, 906 F.3d at 482, citing *Tennessee v. Garner*, 471 U.S. at 11. Put another way, given the unique circumstances of this case, the law is not clearly established that the officers were precluded from using deadly force against Johnson. Thus, the officers are entitled to summary judgment based on their qualified immunity.

In spite of this case law authority, we expect Plaintiff to argue that the force was excessive because Plaintiff was running away from the officers. "After all," the argument will go, "Johnson was running away. It should have been obvious to the officers that because he was running away he was no longer a threat; he was just going to run to the back of the station, hop the fence, overcome the bushes and continue on his way with no threat to the officers."

---

[1] *Ford* was decided prior to the issuance of the Supreme Court's Opinion in *Graham*.

This is precisely the type of "20/20 vision of hindsight" which this Court must avoid when engaging in the qualified immunity analysis. *Conley-Eaglebear v. Miller*, 2017 WL 7116973 at * 2; *Flournoy v. City of Chicago*, 829 F.3d 869, 874 (7th Cir. 2016); *Wilkerson*, 906 F.3d at 482 ("We assume the vantage point of a reasonable officer confronted with the same facts, bearing in mind that decisions occurred in a 'split-second' and making every effort to ignore the advantages of 'the 20/20 vision of hindsight'"), citing *Graham.*

Police officers do not have the immediate clairvoyance necessary to glean the intent of an armed, dangerous subject. As in *Wilkerson*, Johnson "still had . . . the weapon (as the evidence shows he did) and nothing prevented [Johnson] from turning to fire upon the officers." As in *Horton*, "nothing prevented [Johnson] from turning to fire upon the officers."

The law is not clearly established that in circumstances such as this case, police officers must wait and see if a violent subject is going to fire the first shot. The force used in this case was reasonable, both to protect themselves from imminent danger or death and to prevent the escape of a violent fleeing felon. *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018).

## IV. AS A MATTER OF LAW, THE USE OF DEADLY FORCE IN THIS CASE WAS REASONABLE

The arguments which we have made above on the qualified immunity issue are equally applicable on the "constitutional violation" issue. Several of the cases we have cited above, in particular, *Ford* and *Horton*, were decided not on the qualified immunity prong, but on a merits determination that the force used was reasonable and, hence, not violative of the Fourth Amendment. Those principles are equally applicable to this case and argue for the reasonableness of the officers' decisions to shoot.

As discussed above, this Court need not answer the reasonableness issue if it finds that the officers' use of force did not violate clearly-established precedent which a reasonable officer would have known.

V. **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ILLINOIS LAW-BASED COUNT II EXCESSIVE FORCE CLAIM. IN THE ALTERNATIVE, IF THIS COURT GRANTS SUMMARY JUDGMENT ON THE FEDERAL CLAIM, THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIM**

Count II, "Wrongful Death – State Law," alleges that the conduct of the officers constitutes "willful and wanton acts and/or omissions" under Illinois law. See Doc. #22, Amended Complaint, ¶ 24. Under Section 2-202 of the Illinois Tort Immunity Act, 745 ILCS 10/2-202, it is undisputed that the Defendants were engaged in the execution and enforcement of the law, and are hence immune from liability, unless their "act or omission constitutes willful and wanton conduct." Section 1-210 of the Tort Immunity Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."

Under Section 7-5 of the Illinois Criminal Code, a police officer is justified in using force "likely to cause death or great bodily harm" when he "reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes both that: (1) such force is necessary to prevent the arrest from being defeated by resistance or escape; and (2) the person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm, or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay." 720 ILCS 5/7-5.

We incorporate our arguments on the federal issues as arguments in support of summary judgment on Count II. It is undisputed that these officers believed first, that Johnson was committing forcible felonies, including aggravated assault and armed robbery; and further, that deadly force was necessary to prevent death or great harm to themselves. The undisputed evidence shows that such belief was reasonable, and certainly did not rise to the level of willful and wanton conduct as defined by Illinois law. See also, 720 ILCS 5/7-1(b).

Further, a reasonable police officer could believe that deadly force was necessary "to prevent the arrest from being defeated by resistance or escape," and that Johnson "committed . . . a forcible felony which involves the infliction or threatened infliction of great bodily harm," and was also "attempting to escape by use of a deadly weapon or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay."

Accordingly, the Defendants are entitled to summary judgment on the state law excessive force claim. We ask this Court to so find.

In the alternative, if this Court grants summary judgment on the federal claims, it may decline to exercise supplemental jurisdiction over the state law claim. 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (Presumption that a district court should dismiss without prejudice supplemental state law claims if federal claims are dismissed prior to trial).

## VI. CONCLUSION

"Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life or death situations with limited information." *Horton*, 883 F.3d at 950. As in the *Horton* case, the

"events here unfolded in heart-pounding real time with lives on the line. [Officers Sheehan and Perez] lacked our luxury of pausing, rewinding and playing the videos over and over." *Id.*

For the foregoing reasons, the Defendant Officers are entitled to summary judgment.

>Respectfully submitted,
>
>VILLAGE OF DOLTON, PHILLIP SHEEHAN AND RYAN PEREZ
>
>By:     /s/ John B. Murphey

JOHN B. MURPHEY
AMBER M. SAMUELSON
Rosenthal, Murphey, Coblentz & Donahue
30 N. LaSalle Street, Suite 1624
Chicago, Illinois 60602
(312) 541-1070
(312) 541-9191 (fax)
jmurphey@rmcj.com
asamuelson@rmcj.com

# CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

Mark F. Smolens
Nicole L. Barkowski
MOTTWEILER & SMOLENS, LLP
1627 Colonial Parkway
Suite 301
Inverness, IL 60067
Tel: 773.580.4982
ryansmolensjones@hotmail.com
nbarkowski@gmail.com

Brian W. Coffman
Coffman Law Offices
2615 N. Sheffield, Suite #1
Chicago, Illinois 60604
Tel: 773.348.1295
bcoffmanlaw@gmail.com

By:     /s/ John B. Murphey

John B. Murphey
Amber M. Samuelson
Rosenthal, Murphey, Coblentz & Donahue
30 N. LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel: 312.541.1770/Fax: 312.541.9191
jmurphey@rmcj.com
asamuelson@rmcj.com